UNICO, A PARTNERSHIP OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JAMES F. OWEN, DEFENDANT-RESPONDENT.

Argued November 21, 1966—Reargued April 27, 1967—
Decided July 31, 1967.

*Mr. Ernest Prupis* argued the cause for appellant (*Messrs. Weltchek & Weltchek,* attorneys).

*Mr. Steven Wise* argued the cause for respondent (*Messrs. Kaplowitz & Wise,* attorneys).

*Mr. Israel Spicer* argued the cause for New Jersey Bankers Association, *amicus curiae* (*Mr. Richard R. Hellstern,* on the brief).

*Mr. Richard Newman,* Deputy Attorney General, argued the cause for Arthur J. Sills, Attorney General of New Jersey, *amicus curiae.*

The opinion of the court was delivered by

FRANCIS, J. The issue to be decided here is whether plaintiff Unico, a New Jersey partnership, is a holder in due course of defendant's note. If so, it is entitled to a judgment for the unpaid balance due thereon, for which this suit was brought. The District Court found plaintiff was not such a holder and that it was therefore subject to the defense interposed by defendant, maker of the note, of failure of consideration on the part of the payee, which endorsed it to plaintiff. Since it was undisputed that the payee failed to furnish the consideration for which the note was given, judgment was entered for defendant. The Appellate Division affirmed, and we granted plaintiff's petition for certification in order to consider the problem. 47 *N. J.* 241 (1966).

The facts are important. Defendant's wife, Jean Owen, answered an advertisement in a Newark, N. J. newspaper in which Universal Stereo Corporation of Hillside, N. J., offered for sale 140 albums of stereophonic records for $698. This amount could be financed and paid on an installment basis. In addition the buyer would receive "without separate charge" (as plaintiff puts it) a Motorola stereo record player. The plain implication was that on agreement to purchase 140 albums, the record player would be given free. A representative of Universal called at the Owens' home and discussed the matter with Mr. and Mrs. Owen. As a result, on November 6, 1962 they signed a "retail installment contract" for the purchase of 140 albums on the time payment plan proposed by Universal.

Under the printed form of contract Universal sold and Owen bought "subject to the terms and conditions stipulated in Exhibit 'A' hereto annexed and printed on the other side hereof and made part hereof, the following goods * * *: 12 stereo albums to be delivered at inception of program and

every 6 months thereafter until completion of program," a "new Motorola consolo [sic]" and "140 stereo albums of choice * * *." The total cash price was listed as $698; a down-payment of $30 was noted; the balance of $668, plus an "official fee" of $1.40 and a time price differential of $150.32, left a time balance of $819.72 to be paid in installments. Owen agreed to pay this balance in 36 equal monthly installments of $22.77 each beginning on December 12, 1962, "at the office of Universal Stereo Corp., 8 Hollywood Avenue, Hillside, N. J., or any other address determined by assignee." The contract provided:

"If the Buyer executed a promissory note of even date herewith in the amount of the time balance indicated, said note is not in payment thereof, but is a negotiable instrument separate and apart from this contract even though at the time of execution it may be temporarily attached hereto by perforation or otherwise."

It was part of Universal's practice to take notes for these contracts, and obviously there was no doubt that it would be done in the Owen case. Owen did sign a printed form of note which was presented with the contract. The name of Universal Stereo Corporation was printed thereon, and the note provided for the monthly installment payments specified. On the reverse side was an elaborate printed form of endorsement which began "Pay to the order of Unico, 251 Broad St., Elizabeth, New Jersey, with full recourse;" and which contained various waivers by the endorser, and an authorization to the transferee to vary the terms of the note in its discretion in dealing with the maker.

Exhibit "A," referred to as being on the reverse side of the contract, is divided into three separate parts, the body of each part being in very fine print. The *first* section sets out in 11 fine print paragraphs the obligations of the buyer and rights of the seller. Under paragraph 1 the seller retains title to the property until the full time price is paid. Here it may be noted that Universal recorded the contract in the Union County Register's Office a few days after its execution.

Paragraph 2 says that the term "Seller" as used shall refer to the party signing the contract as seller "or *if said party has assigned said contract, any holder of* said contract." (Emphasis added) It is patent that Universal contemplated assigning the contract forthwith to Unico, and it was so assigned. Of course, it was a bilateral executory contract, and since under the language just quoted "assignee" and "seller" have the same connotation, the reasonable and normal expectation by Owen would be that performance of the delivery obligation was a condition precedent to his undertaking to make installment payments. See, 3 *Williston on Contracts* (*3d ed. Jaeger* 1960) § 418, 418A. It has not been suggested that this assignment provision which equates "seller" with "assignee" creates such an intimate relationship between Universal and Unico as to impose Universal's delivery performance obligation on Unico as well as to transfer Universal's right to payment to Unico. Consequently the question is reserved for future consideration in an appropriate case under the Uniform Commercial Code. See *N. J. S.* 12A:2–210(4). In view of the comprehensive language employed, is such an assignment one for security only? Note New Jersey Study Comment 5, and Uniform Commercial Code Comment 5, to *subsection* 4. Universal sought under paragraph 5 to deprive Owen of his right to plead failure of consideration against its intended assignee, Unico. The paragraph provides:

"Buyer hereby acknowledges notice that the contract may be assigned and that assignees will rely upon the agreements contained in this paragraph, and agrees that the liability of the Buyer to any assignee shall be immediate and absolute and not affected by any default whatsoever of the Seller signing this contract; and in order to induce assignees to purchase this contract, the Buyer further agrees not to set up any claim against such Seller as a defense, counterclaim or offset to any action by any assignee for the unpaid balance of the purchase price or for possession of the property."

The validity and efficacy of this paragraph will be discussed hereinafter. At this point it need only be said that the design of Universal in adopting this form of contract and presenting

it to buyers, not for bargaining purposes but for signature, was to get the most and give the least. Overall it includes a multitude of conditions, stipulations, reservations, exceptions and waivers skillfully devised to restrict the liability of the seller within the narrowest limits, and to leave no avenue of escape from liability on the part of the purchaser.

The *second* part of Exhibit "A" is entitled in large type, "Assignment and dealer's recommendation. This must be executed by the dealer." There follows an elaborate fine-print form of assignment of the contract and the rights thereunder to Unico, which name is part of the printed form. It is signed by Murray Feldman, President of Universal.

The *third* part of Exhibit "A" is entitled "Guaranty." It is a printed form signed by Murray Feldman, as President, and Rhea M. Feldman, as Secretary, of Universal, and also as individuals guaranteeing payment of the sums due under Owen's contract to Unico.

As Exhibit "A" appears in the appendix, the Owen note referred to above is not now attached to the contract. The record is not clear as to just how it was attached originally, *i. e.*, by a perforated line or otherwise; indication from the agreement itself is that it was attached, and was removed after execution and after or upon endorsement to Unico. In any event it was presented to and executed by Owen with the contract, and in view of the result we have reached in the case, whether it was attached or simply presented to Owen for signature with the contract is of no particular consequence.

At this point the hyper-executory character of the performance agreed to by Universal in return for the installment payment stipulation by Owen must be noted. Owen's time balance of $819.72 was required to be paid by 36 monthly installments of $22.77 each. Universal's undertaking was to deliver 24 record albums a year until 140 albums had been delivered. Completion by the seller therefore would require 5-1/3 years. Thus, although Owen would have fully paid for 140 albums at the end of three years, Universal's delivery obligation did not have to be completed until 2-1/3 years thereafter. This

means that 40% of the albums, although fully paid for, would still be in the hands of the seller. It means also that for 2-1/3 years Universal would have the use of 40% of Owen's money on which he had been charged the high time-price differential rate. In contrast, since Universal discounted the note immediately with Unico on the strength of Owen's credit and purchase contract, the transaction, so far as the seller is concerned, can fairly be considered as one for cash. In this posture, Universal had its sale price almost contemporaneously with Owen's execution of the contract, in return for an executory performance to extend over 5-1/3 years. And Unico acquired Owen's note which, on its face and considered apart from the remainder of the transaction, appeared to be an unqualifiedly negotiable instrument. On the other hand, on the face of things, by virtue of the ostensibly negotiable note and the waiver or estoppel clause quoted above which was intended to bar any defense against an assignee for the seller's default, Owen had no recourse and no protection if Universal defaulted on its obligation and was financially worthless.

Owen's installment note to Universal for the time balance of $819.72 is dated November 6, 1962. Although the endorsement on the reverse side is not dated, Unico concedes the note was received on or about the day it was made. The underlying sale contract was assigned to Unico at the same time, and it is admitted that Owen was never notified of the assignment.

Owen received from Universal the stereo record player and the original 12 albums called for by the contract. Although he continued to pay the monthly installments on the note for the 12 succeeding months, he never received another album. During that period Mrs. Owen endeavored unsuccessfully to communicate with Universal, and finally ceased making payments when the albums were not delivered. Nothing further was heard about the matter until July 1964, when the attorney for Unico, who was also one of its partners, advised Mrs. Owen that Unico held the note and that payments should be made to it. She told him the payments would be resumed if the albums were delivered. No further deliveries were made be-

cause Universal had become insolvent. Up to this time Owen had paid the deposit of $30 and 12 installments of $22.77 each, for a total of $303.24. Unico brought this suit for the balance due on the note plus penalties and a 20% attorney's fee.

Owen defended on the ground that Unico was not a holder in due course of the note, that the payment of $303.24 adequately satisfied any obligation for Universal's partial performance, and that Universal's default and the consequent failure of consideration barred recovery by Unico. As we have said, the trial court found plaintiff was not a holder in due course of the note and that Universal's breach of the sales contract barred recovery.

I

This brings us to the primary inquiry in the case. Is the plaintiff Unico a holder in due course of defendant's note?

The defendant's note was executed on November 6, 1962. The Uniform Commercial Code, *N. J. S.* 12A:1–101 *et seq.,* was adopted by the Legislature in 1961 (*L.* 1961, *c.* 120), but it did not become operative until January 1, 1963. The note, therefore, is governed by the Uniform Negotiable Instruments Law, *N. J. S. A.* 7:1–1 *et seq. Section* 52 thereof defined a holder in due course as one who (among other prerequisites) took the instrument "in good faith and for value." *N. J. S. A.* 7:2–52. If plaintiff is not a holder in due course it is subject to the defense of failure of consideration on the part of Universal, both under the Negotiable Instruments Law, *N. J. S. A.* 7:2–58, and the Uniform Commercial Code, *N. J. S.* 12A:3–306(c).

In the field of negotiable instruments, good faith is a broad concept. The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would seem to follow, therefore, that the more the holder knows about the un-

derlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving, credit-extending commercial world.

We are concerned here with a problem of consumer goods financing. Such goods are defined in the Uniform Commercial Code as those used or bought for use primarily for personal, family or household purposes. *N. J. S.* 12A:9–109(1). Although the Code as such is not applicable in this case, the definition is appropriate for our purposes. And it is fair to say also that in today's society, sale of such goods and arrangements for consumer credit financing of the sale are problems of increasing state and national concern. The consumer-credit market is essentially a process of exchange, the general nature of which is shaped by the objectives and relative bargaining power of each of the parties. In consumer goods transactions there is almost always a substantial differential in bargaining power between the seller and his financer, on the one side, and the householder on the other. That difference exists because generally there is a substantial inequality of economic resources between them, and of course, that balance in the great mass of cases favors the seller and gives him and his financer the power to shape the exchange to their advantage. Their greater economic resources permit them to obtain the advice of experts; moreover, they have more time to reflect about the specific terms of the exchange prior to the negotiations with the consumer; they know from experience how to strengthen their own position in consumer-credit arrangements; and the financer-creditor is better able to absorb the impact of a single imprudent or unfair exchange. See *Curran, Legislative Controls as a Response to Consumer-Credit Problems,* 8 *B. C. Ind. and Com. L. Rev.* 409, 435–437 (1967).

■ Mass marketing in consumer goods, as in many other commercial activities, has produced standardized financing contracts. *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358, 389 (1960). As a result there is no real arms-length bargaining between the creditor (seller-financer) and the consumer, beyond minimal negotiating about amount of credit, terms of installment payment and description of the goods to be purchased, all of which is accomplished by filling blanks left in the jungle of finely printed, creditor-oriented provisions. In the present case the purchase contract was a typical standardized finely printed form, focused practically in its entirety upon the interests of the seller and its intended assignee. Little remained to be done but to describe the stereo record player and to fix the price and terms of installment payment by filling in the blanks. Even as to the matter inserted in the blanks, it cannot be said that there was any real bargaining; the seller fixed the price of the albums, and, as we shall see, the plaintiff Unico as the financer for Universal established the maximum length of the installment payment period under its contract with Universal. The ordinary consumer goods purchaser more often than not does not read the fine print; if he did it is unlikely that he would understand the legal jargon, and the significance of the clauses is not explained to him. This is not to say that all such contracts of adhesion are unfair or constitute imposition. But many of them are, and the judicial branch of the government within its sphere of operation in construing and applying such contracts must be responsive to equitable considerations. As the late Mr. Justice Frankfurter said in *United States v. Bethlehem Steel Corp.*, 315 *U. S.* 289, 326, 62 *S. Ct.* 581, 599, 86 *L. Ed.* 855, 876 (1942):

"But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not en-

force transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?"

And see, *Henningsen v. Bloomfield Motors, 32 N. J.,* at *p.* 388, 390; 1 *Corbin on Contracts,* § 128 (1963). Just as the community has an interest in insuring (usually by means of the legislative process) that credit financing contracts facilitating sales of consumer goods conform to community-imposed standards of fairness and decency, so too the courts, in the absence of controlling legislation, in applying the adjudicatory process must endeavor, whenever reasonably possible, to impose those same standards on principles of equity and public policy. An initial step in that direction of unquestioned need, and fortunately of common judicial acceptance, is the view that consumer goods contracts and their concurrent financing arrangements should be construed most strictly against the seller who imposed the contract on the buyer, and against the finance company which participated in the transaction, directly or indirectly, or was aware of the nature of the seller's consumer goods sales and installment payment operation.

The courts have recognized that the basic problem in consumer goods sales and financing is that of balancing the interest of the commercial community in unrestricted negotiability of commercial paper against the interest of installment buyers of such goods in the preservation of their normal remedy of withholding payment when, as in this case, the seller fails to deliver as agreed, and thus the consideration for his obligation fails. Many courts have solved the problem by denying to the holder of the paper the status of holder in due course where the financer maintains a close relationship with the dealer whose paper he buys; where the financer is closely connected with the dealer's business operations or with the particular credit transaction; or where the financer furnishes the form of sale contract and note for use by the dealer, the buyer signs the contract and note concurrently, and the dealer endorses the note and assigns the contract immediately thereafter or

within the period prescribed by the financer. *Industrial Credit Company v. Mike Bradford & Co.,* 177 *So.* 2d 878 (*D. C. App. Fla.* 1965); *International Finance Corporation v. Rieger,* 272 *Minn.* 192, 137 *N. W.* 2d 172 (1965); *Local Acceptance Company v. Kinkade,* 361 *S. W.* 2d 830 (*Sup. Ct. Mo.* 1962); *Mutual Finance Co. v. Martin,* 63 *So.* 2d 649, 44 *A. L. R.* 2d 1 (*Sup. Ct. Fla.* 1953); *Commercial Credit Corp. v. Orange County Mach. Wks.,* 34 *Cal.* 2d 766, 214 *P.* 2d 819 (1950); *Commercial Credit Co. v. Childs,* 199 *Ark.* 1073, 137 *S. W.* 2d 260, 128 *A. L. R.* 726 (1940). Other courts have said that when the financer supplies or prescribes or approves the form of sales contract, or conditional sale agreement, or chattel mortgage as well as the installment payment note (particularly if it has the financer's name printed on the face or in the endorsement), and all the documents are executed by the buyer at one time and the contract assigned and note endorsed to the financer and delivered to the financer together (whether or not attached or part of a single instrument), the holder takes subject to the rights and obligations of the seller. The transaction is looked upon as a species of tripartite proceeding, and the tenor of the cases is that the financer should not be permitted "to isolate itself behind the fictional fence" of the Negotiable Instruments Law, and thereby achieve an unfair advantage over the buyer. *State Nat. Bank of El Paso, Tex. v. Cantrell,* 47 *N. M.* 389, 143 *P.* 2d 592, 152 *A. L. R.* 1216 (1943); *Buffalo Industrial Bank v. DeMarzio,* 162 *Misc.* 742, 296 *N. Y. S.* 783 (*Cty. Ct.* 1937)[1]; and see, *First & Lumbermen's Nat. Bank v. Buchholz,* 220 *Minn.* 97, 18 *N. W.* 2d 771 (1945); *Consumer Sales Financing,* 102 *U. Pa. L. Rev.* 782, 789–790 (1954).

Before looking at the particular circumstances of the above cases, it seems advisable to examine into the relationship between Universal and the financer Unico.

---

[1] On appeal to the Supreme Court, this case was reversed on the sole ground that the defendant-appellee failed to appear. 6 *N. Y. S.* 2d 568 (1937).

Unico is a partnership formed expressly for the purpose of financing Universal Stereo Corporation, and Universal agreed to pay all costs up to a fixed amount in connection with Unico's formation. The elaborate contract between them, dated August 24, 1962, recited that Universal was engaged in the merchandising of records and stereophonic sets, and that it desired to borrow money from time to time from Unico, "secured by the assignment of accounts receivable, promissory notes, trade acceptances, conditional sales contracts, chattel mortgages, leases, installment contracts, or other forms of agreement evidencing liens." Subject to conditions set out in the agreement, Unico agreed to lend Universal up to 35% of the total amount of the balances of customers' contracts assigned to Unico subject to a limit of $50,000, in return for which Universal submitted to a substantial degree of control of its entire business operation by the lender. As collateral security for the loans, Universal agreed to negotiate "to the lender" all customers' notes listed in a monthly schedule of new sales contracts, and to assign all conditional sale contracts connected with the notes, as well as the right to any monies due from customers.

Specific credit qualifications for Universal's record album customers were imposed by Unico; requirements for the making of the notes and their endorsement were established, and the sale contracts had to be recorded in the county recording office. All such contracts were required to meet the standards of the agreement between lender and borrower, among them being that the customer's installment payment term would not exceed 36 months and "every term" of the Unico-Universal agreement was to "be deemed incorporated into all assignments" of record sales contracts delivered as security for the loans. It was further agreed that Unico should have all the rights of Universal under the contracts as if it were the seller, including the right to enforce them in its name, and Unico was given an irrevocable power to enforce such rights.

In the event of Universal's default on payment of its loans, Unico was authorized to deal directly with the record buyers with respect to payment of their notes and to settle with and discharge such customers. Unico was empowered to place its representatives on Universal's premises with full authority to take possession of the books and records; or otherwise, it could inspect the records at any time; and it was given a "special property interest" in such records. Financial statements were required to be submitted by Universal "at least semi-annually"; and two partners of Unico were to be paid one-quarter of one per cent interest on the loans as a management service charge, in addition to the interest to be paid Unico. Significant also in connection with the right to oversee Universal's business is a warranty included in the contract. It warrants that Universal owns free and clear "all merchandise referred to and described in [the sales] contracts, * * * at the time of making the sale creating such contracts." Obviously this was not the fact, otherwise Universal would not have discontinued shipping records to its customers, such as Owen. If Universal did not have such a store of records, as warranted, Unico might well have had reason to suspect its borrower's financial stability.

This general outline of the Universal-Unico financing agreement serves as evidence that Unico not only had a thorough knowledge of the nature and method of operation of Universal's business, but also exercised extensive control over it. Moreover, obviously it had a large, if not decisive, hand in the fashioning and supplying of the form of contract and note used by Universal, and particularly in setting the terms of the record album sales agreement, which were designed to put the buyer-consumer in an unfair and burdensome legal strait jacket and to bar any escape no matter what the default of the seller, while permitting the note-holder, contract-assignee to force payment from him by enveloping itself in the formal status of holder in due course. To say the relationship between Unico and the business operations of Universal was close, and that Unico

was involved therein, is to put it mildly. There is no case in New Jersey dealing with the contention that the holder of a consumer goods buyer's note in purchasing it did not meet the test of good faith negotiation because the connection between the seller and the financer was as intimate as in this case. Compare, *James Talcott, Inc. v. Shulman*, 82 *N. J. Super.* 438 (*App. Div.* 1964); *Westfield Investment Co. v. Fellers*, 74 *N. J. Super.* 575 (*Law Div.* 1962).

There is a conflict of authority in other jurisdictions (Annotation, 44 *A. L. R.* 2d 8 (1955)), but we are impelled for reasons of equity and justice to join those courts which deny holder in due course status in consumer goods sales cases to those financers whose involvement with the seller's business is as close, and whose knowledge of the extrinsic factors—*i. e.*, the terms of the underlying sale agreement— is as pervasive, as it is in the present case. Their reasoning is particularly persuasive in this case because of the unusually executory character of the seller's obligation to furnish the consideration for the buyer's undertaking.

In *Commercial Credit Corp. v. Orange County Mach. Wks.*, 34 *Cal.* 2d 766, 214 *P.* 2d 819 (1950), Machine Works was in the market for a press. Ermac Company knew of one which could be purchased from General American Precooling Corporation for $5,000, and offered to sell it to Machine Works for $5,500. Commercial Credit was consulted by Ermac, and agreed to finance the transaction by taking an assignment of the contract of sale between Ermac and Machine Works. For a substantial period before this time, Ermac had obtained similar financing from Commercial Credit and had some blank forms supplied to it by the latter. By a contract written on one of these forms, which was entitled "Industrial Conditional Sales Contract," Ermac agreed to sell and Machine Works bound itself to purchase the press.

The terms of the contract were very much like those in the case now before us. The purchase price was to be paid in 12 equal monthly installments, "evidenced by my note of even date to your order." As to the note, the contract said:

"Said note is a negotiable instrument, separate and apart from this contract, even though at the time of execution it may be temporarily attached hereto by perforation or otherwise."

It provided also, as in our case:

"This contract may be assigned and/or said note may be negotiated without notice to me and when assigned and/or negotiated shall be free from any defense, counterclaim or cross complaint by me."

The note originally was the latter part of the printed form of contract, but could be detached from it at a dotted or perforated line.

Machine Works made the required down payment to Ermac, which in turn under its contract with Commercial assigned the contract and endorsed the note to the latter. Commercial then gave its check to Ermac for $4,261. Ermac sent its check to Precooling Corporation, which refused to deliver the press to Machine Works when the check was dishonored. Commercial sued Machine Works as a holder in due course of its note to Ermac. Machine Works contended Commercial was not entitled to the status of such a holder because the sales contract and attached note should be construed as constituting a single document. Machine Works contended also that the finance company was a party to the original transaction rather than a subsequent purchaser, that it took subject to all equities and defenses existing in its favor against Ermac, and that the claimed negotiability of the note was destroyed when it and the conditional sales agreement were transferred together as one instrument.

The Supreme Court of California said the fact that the contract and note were physically attached at the time of transfer to Commercial would not alone defeat negotiability. But the court pointed out that Commercial advanced money to Ermac (with which it had dealt previously and whose "credit had been checked and financial integrity demonstrated"), with the understanding that the agreement and note would be assigned and endorsed to it immediately; and that "[i]n a very real sense, the finance company was a mov-

ing force in the transaction from its very inception, and acted as a party to it." In deciding against Commercial, the court said:

"When a finance company actively participates in a transaction of this type from its inception, counseling and aiding the future vendor-payee, it cannot be regarded as a holder in due course of the note given in the transaction and the defense of failure of consideration may properly be maintained. Machine Works never obtained the press for which it bargained and, as against Commercial, there is no more obligation upon it to pay the note than there is to pay the installments specified in the contract."

In the case before us Unico was brought into existence to finance all Universal's sales contracts, and it was a major factor in establishing the terms upon which the financing and installment payment of the resulting notes and installment delivery of the record albums were to be engaged in. As in the case just cited, it too was "in a very real sense" a party not only to the Owen contract, but to all others similarly procured by Universal.

In *Local Acceptance Company v. Kinkade*, 361 *S. W. 2d* 830 (*Sup. Ct. Mo.* 1962), a dealer in sewing machines sold a machine to defendants. In return they gave a chattel mortgage and a note to be paid in 24 monthly installments. As a part of the contract the dealer agreed to furnish pre-cut garments to the purchaser-wife, which she agreed to sew and for which the dealer would pay her $15 per month, the same amount as the monthly payments on the note. The plaintiff finance company purchased the note and contract with knowledge of the manner in which the dealer operated its business. Thereafter, because of financial difficulty, the dealer became unable to supply the pre-cut garments and the purchasers declined to pay any further installments on the note.

In denying recovery to plaintiff, the court declared it was not necessary that the financer know in advance of the execution of this specific note and of the contemporaneous execution of the particular "sew" contract. It was sufficient that the plaintiff knew in advance of any sales that they

were to be made exclusively upon that method, and assented to the method.

Among other things, the .court said:

"It has often been held that a contemporaneous written contract, entered into between the original parties to a note, and connected .with the note by direct reference or by necessary implication, may affect the payee's right to recover against the maker, and that the two instruments should be considered together as the entire contract."

And it held, in view of plaintiff's knowledge of the dealer's course of business, that there was substantial evidence requiring the submission to the jury of plaintiff's status as a holder in due course as dependent upon its "knowledge" or "good faith." It sustained a charge to the jury that knowledge by the financer of the plan employed by the seller in selling the sewing machines prior to the time it received the note and chattel mortgage would put it in the same position as the seller, and if the seller defaulted in the terms of the sale, the financer could not recover.

The Supreme Court of Minnesota reached the same result in *International Finance Corporation. v. Rieger, supra*. There defendant Rieger purchased four dry-cleaning machines from a dealer under a conditional sale contract. Rieger made the down payment required thereby and agreed to pay the balance plus the time payment differential. He signed a note bearing the same date as the contract, which called for fixed monthly payments. The dealer transferred the note and assigned the contract, as well as certain other documents evidencing the sale, to the plaintiff finance company and thereupon was paid a substantial sum by it. The dealer agreed with Rieger that there would be no obligation on his part until the machines were installed to his satisfaction and he executed and delivered an installation certificate to that effect, as required by the finance company. The machines were never installed so as to work properly, but the dealer delivered to the financer an installation certificate on which Rieger's signature had been forged. Rieger demanded of

the dealer and plaintiff that they remedy the condition or remove the machines. Neither was done and defendant refused to make the installment payments on the note.

When the finance company sued on the note, Rieger defended on the ground that it was not a holder in due course and therefore was subject to his defense of failure of consideration. The evidence showed that the plaintiff had previously furnished the dealer with printed forms of note, conditional sale contract, and other documents to be executed by the purchaser, with plaintiff's name printed on the forms, had instructed the dealer as to the manner of completing the forms, had knowledge that the transaction involved the sale of machines to be installed in accordance with contract provisions before defendant would become liable on the note and contract; that plaintiff had informed the dealer of its policy of requiring a delivery and satisfactory installation certificate to be signed by the purchaser; and that the dealer had furnished such a certificate which had been forged by the dealer before the conditional sales contract and note were transferred to plaintiff.

The court, in sustaining the trial judge's finding that plaintiff was not a holder in due course, said:

"This is consistent with numerous decisions from various jurisdictions, including Minnesota, which hold that, where a note has been executed concurrently with a conditional sales contract for the sale of equipment to be installed to the buyer's satisfaction, or otherwise in compliance with contract terms, an assignee of the note and conditional sales contract, who has participated in the transaction from its origin so as to have acquired knowledge of the conditional liability of the purchaser or maker of the note, does not become a holder of the note in due course." 137 *N. W.* 2*d*, at *p.* 177.

To the same effect are *Industrial Credit Company v. Mike Bradford & Co., Mutual Finance Co. v. Martin,* and *Commercial Credit Co. v. Childs,* all *supra.* The *Martin* case, decided by the Supreme Court of Florida, is frequently cited by the courts of other states. Martin purchased a deep freezer and meat saw from an appliance dealer on an installment payment conditional sale agreement. He executed the agreement and a

note (attached thereto by perforations) for payment of the balance due in monthly installments. On the following day the sale agreement and note were assigned and endorsed respectively to the plaintiff-finance company. The freezer turned out to be an outmoded model and otherwise totally unfit for Martin's purposes, and when neither the dealer nor the financer remedied the defects he declined to make further payments on the note.

The finance company prepared and furnished to the dealer the printed forms of conditional sale agreement and promissory note employed in the transaction. The forms designated the financer as the specific assignee of the contract and note; its office was designated as the place of payment of the note installments; it investigated and approved Martin's credit, agreed to purchase his contract and note, and by written assignment took the contract and note contemporaneously from the dealer.

In deciding that the finance company was not a holder in due course, the court declared it saw no reason why the concurrent execution of such a contract along with a promissory note, whether the note is a separate piece of paper or is attached to the contract by perforations, of itself should in any way affect "any of the characteristics of the note which give it commercial value." But, referring to the conflicting decisions in various states, it said that in situations such as the one before it, the better rule is that the note and the contract should be considered as one instrument. It approved the language of the Arkansas Supreme Court in *Commercial Credit Co. v. Childs, supra,* to the effect that the financer was so closely connected with the entire transaction that it could not be heard to say that it, in good faith, was an innocent purchaser for value; rather, to all intents and purposes it was a party to the agreement and instrument from the beginning.

The finance company in *Martin,* as in this case, contended that to deny it holder in due course status would seriously affect the mode of transacting business in Florida. In answer, the Court said:

> "It may be that our holding here will require some changes in business methods and will impose a greater burden on the finance companies. We think the buyer—Mr. & Mrs. General Public—should have some protection somewhere along the line. We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers." 63 *So. 2d*, at *p.* 653.

In our judgment the views expressed in the cited cases provide the sound solution for the problem under consideration. Under the facts of our case the relationship between Unico and Universal, and the nature of Unico's participation in Universal's contractual arrangements with its customers, if anything are closer and more active than in any of those cases, and in justice Unico should not be deemed a holder in due course of the Owen note. Adoption of such a rule is consistent in theory with the Court of Errors and Appeals' holding in *General Contract etc. Corp. v. Moon Carrier Corp.*, 129 *N. J. L.* 431, 435 (*E. & A.* 1943), where it was said that where a note refers to or is accompanied by a collateral, contemporaneous agreement, or the purchaser has actual knowledge of the collateral agreement, he takes subject to its contents and conditions. Moreover, although as we have already noted, the Uniform Commercial Code is not applicable because its effective date was subsequent to Owen's note, the principle we now espouse is consistent with § 3–119 thereof. *N. J. S.* 12A:3–119. That section provides that:

> "As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument."

██ For purposes of consumer goods transactions, we hold that where the seller's performance is executory in character and when it appears from the totality of the arrangements between dealer and financer that the financer has had a substantial voice in setting standards for the

underlying transaction, or has approved the standards established by the dealer, and has agreed to take all or a predetermined or substantial quantity of the negotiable paper which is backed by such standards, the financer should be considered a participant in the original transaction and therefore not entitled to holder in due course status. We reserve specifically the question whether, when the buyer's claim is breach of warranty as distinguished from failure of consideration, the seller's default as to the former may be raised as a defense against the financer. *Cf. Eastern Acceptance Corp. v. Kavlick,* 10 *N. J. Super.* 253 *(App. Div.* 1950).

## II

Plaintiff argues that even if it cannot be considered a holder in due course of Owen's note, it is entitled to recover regardless of the failure of consideration on the part of Universal, because of the so-called waiver of defenses or estoppel clause contained in the sale contract. The clause says:

. "Buyer hereby acknowledges notice that this contract may be assigned and that assignees will rely upon the agreements contained in this paragraph, and agrees that the liability of the Buyer to any assignee shall be immediate and absolute and not affected by any default whatsoever of the Seller signing this contract; and in order to induce assignees to purchase this contract, the Buyer further agrees not to set up any claim against such Seller as a defense, counterclaim or offset to any action by any assignee for the unpaid balance of the purchase price or for possession of the property."

This provision is the fifth of 11 fine print paragraphs on the reverse side of the sale contract. The type is the same as in the other clauses; there is no emphasis put on it in the context, and there is no evidence that it was in any way brought to Owen's attention or its significance explained to him. But regardless, we consider that the clause is an unfair imposition on a consumer goods purchaser and is contrary to public policy.

The plain attempt and purpose of the waiver is to invest the sale agreement with the type of negotiability which under the Negotiable Instruments Law would have made the holder of a negotiable promissory note a holder in due course and entitled to recover regardless of the seller-payee's default.

In our judgment such a clause in consumer goods conditional sale contracts, chattel mortgages, and other instruments of like character is void as against public policy for three reasons: (1) it is opposed to the policy of the Negotiable Instruments Law which had established the controlling prerequisites for negotiability, and provided also that the rights of one not a holder in due course were subject to all legal defenses which the maker of the instrument had against the transferor. *N. J. S. A.* 7:2–58; (2) it is opposed to the spirit of *N. J. S.* 2A:25–1, which provides that an obligor sued by an assignee "shall be allowed * * * all * * * defenses he had against the assignor or his representatives before notice of such assignment was given to him" (It is conceded here that plaintiff gave no notice of the assignment to defendant); and (3) the policy of our state is to protect conditional vendees against imposition by conditional vendors and installment sellers. See, *N. J. S. A.* 17: 16C–1 *et seq.;* and see, *Dearborn Motors Credit Corporation v. Neel,* 184 *Kan.* 437, 337 *P. 2d* 992 (1959); *Quality Finance Company v. Hurley,* 337 *Mass.* 150, 148 *N. E. 2d* 385 (1958); *American Nat. Bank v. A. G. Sommerville, Inc.,* 191 *Cal.* 364, 216 *P.* 376 (1923); *San Francisco Securities Corporation v. Phoenix Motor Co.,* 25 *Ariz.* 531, 220 *P.* 229 (1923); Annotation, 44 *A. L. R. 2d* 8, 167 (1955); Helstad, *Consumer Credit Legislation: Limitations on Contractual Terms,* 8 *B. C. Ind. and Com. L. Rev.* 519, 531 (1967); Felsenfeld, *Some Ruminations About Remedies in Consumer-Credit Transactions, Id,* at *pp.* 535, 549 (1967).

*Section* 9–206(1) of the Uniform Commercial Code (Secured Transactions) deals with this problem. It provides:

"Subject to any statute or decision which establishes a different rule for buyers of *consumer goods*, an agreement by a buyer that he will not assert against an assignee any claim or defense which he may have against the seller is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Chapter on Commercial Paper (Chapter 3). A buyer who as part of one transaction signs both a negotiable instrument and a security agreement makes such an agreement." (Emphasis ours)

In this section of the Code, the Legislature recognized the possibility of need for special treatment of waiver clauses in consumer goods contracts. Such contracts, particularly those of the type involved in this case, are so fraught with opportunities for misuse that the purchasers must be protected against oppressive and unconscionable clauses. And *section* 9–206 in the area of consumer goods sales must as a matter of policy be deemed closely linked with *section* 2–302, *N. J. S.* 12A:2–302, which authorizes a court to refuse to enforce any clause in a contract of sale which it finds is unconscionable. We see in the enactment of these two sections of the Code an intention to leave in the hands of the courts the continued application of common law principles in deciding in consumer goods cases whether such waiver clauses as the one imposed on Owen in this case are so one-sided as to be contrary to public policy. *Cf. Williams v. Walker-Thomas Furniture Co.,* 121 *U. S. App. D. C.* 315, 350 *F. 2d* 445, 448–449 (1965). For reasons already expressed, we hold that they are so opposed to such policy as to require condemnation. As the New Jersey Study Comment to *section* 2–302 indicates, the practice of denying relief because of unconscionable circumstances has long been the rule in this state. See, *Henningsen v. Bloomfield Motors, supra,* 32 *N. J.,* at *p.* 386 *passim; Kuzmiak v. Brookchester, Inc.,* 33 *N. J. Super.* 575 (*App. Div.* 1955); *Reinhardt v. Passaic-Clifton Nat. Bank,* 16 *N. J. Super.* 430 (*App. Div.* 1951), affirmed 9 *N. J.* 607 (1952); *Hemhauser v. Hemhauser,* 110 *N. J. Eq.* 77 (*Ch.* 1932); *N. J. S.* 12A:2–302, New Jersey Study Comment 1.

*Elzey v. Ajax Heating Company,* 10 *N. J. Misc.* 281 *(Cir. Ct.* 1932), has been cited as contrary to the result we have reached on this point. To the extent that it is in conflict, it is overruled.

For the reasons stated, we hold the waiver clause unenforceable and invalid against Owen.

### III

We agree with the result reached in the tribunals below. Plaintiff offered no proof in the trial court to show that the value of the 12 albums Owen received before breach of the contract by Universal, together with that of the record player at the time of the breach (assuming its value was material in view of the seller's representation that there was to be no charge for it), was in excess of the $303.24 paid by Owen under the contract. Moreover, there has been no suggestion throughout this proceeding that plaintiff is entitled to a partial recovery on the note in its capacity as an assignee thereof. Accordingly, the judgment for the defendant is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN — 6.

*For reversal* — None.