**FIDELITY BANK, NATIONAL ASSOCIATION, Plaintiff,**

v.

**Julian E. AVRUTICK, et al., Defendants.**

Nos. 88 Civ. 6038–6063 (MBM), 89 Civ. 0866–0868 (MBM) and 89 Civ. 0870–0880 (MBM).

United States District Court, S.D. New York.

June 18, 1990.

Stephen F. Ellman, David B. Chenkin, Michael L. Slonim, Zeichner Ellman & Krause, New York City, for plaintiff.

Robert W. Piken, Marilyn D. Piken, New York City, for defendants, except Santangelo.

## OPINION AND ORDER

MUKASEY, District Judge.

This motion for summary judgment relates to 37 unconsolidated cases[1] brought by Fidelity Bank, against each defaulting investor in a limited partnership, to collect sums due under promissory notes executed in connection with the partnership. Defendants contend that these notes were procured by fraud, and that plaintiff's notice of this fraud bars plaintiff from asserting the rights of a holder in due course. Defendants have raised a genuine issue of material fact as to whether fraud underlay the partnership transaction, as well as an issue as to Fidelity's status as either a holder in due course or a transferee of such a holder's rights. Therefore, plaintiff's motion is denied as to all defendants except those specified in Section V of this opinion, who as alleged participants in the fraud may not themselves assert the defense of fraud absent evidence that they were victims rather than perpetrators of the fraud.

### I.

This case arises out of a complex series of financial transactions whose details and rationale are far from clear from the evidence presented on this motion. Defendants here purchased units in the Deep Creek Timber Associates I Limited Partnership, a partnership established under Oregon law to acquire parcels of property and timber in Oregon and Washington. Two general partners managed the partnership: the individual general partner, Richard Birkins, and the managing general partner, Timber Management, Inc., which was controlled by James J. Spolyar. In 1983, Deep Creek made an unsuccessful attempt to sell limited partnership units. Thereafter, Deep Creek attempted another offering of units, as evidenced by a Private Placement Memorandum (PPM) dated January 10, 1984. (PX C)[2] The offering was for 50 units at $159,000 per unit, for a total of $7,950,000, with a minimum investment of one-quarter unit per limited partner.

To purchase units in the partnership, investors paid an initial installment of $15,000 per unit, and then executed 5–year promissory notes, payable in five installments, for the remainder of the purchase price. According to the PPM, investors also filled out financial and other forms, allegedly to enable the partnership to obtain an investor bond guaranteeing these notes, and to buy credit life insurance insuring each investor's life in an amount equal to the outstanding balance of his or her promissory note. (PX C at 2)

During the initial offering in 1983, Spolyar asked Peter Riebling, president of Surety Intermediaries, Inc., to help find a surety to guarantee payment of the investor notes in connection with the partnership. (Riebling Aff. at ¶ 4) Riebling referred Deep Creek's PPM to the Mutual Fire Marine and Inland Insurance Company, whose holding company was also part owner of Surety Intermediaries. According to Riebling, Mutual Fire's counsel helped draft Deep Creek's PPM, and eventually Mutual Fire issued a letter in March 1984 committing to issue the surety bond. (Riebling Aff. at ¶ 5; DX H) The PPM, issued in January, recited that Mutual Fire had committed not only to issue the surety bond, but also to provide the initial loan of $5.3 million to buy the property; the commitment letter issued by Mutual Fire in March recited that Mutual Fire would finance the whole transaction if Deep Creek could not find another lender. (DX C)

Allegedly, after receiving the Mutual Fire commitment letter in March, 1984, Spolyar attempted to obtain financing from New York banks, but was unsuccessful. Spolyar thereafter talked to the president

---

1. There are 40 cases before this court related to the group of promissory notes at issue, but default judgments have been entered in three of these cases: *Fidelity Bank v. James J. Spolyar,* 88 Civ. 6053; *Fidelity Bank v. Janice Kempenich,* 88 Civ. 6043; and *Fidelity Bank v. Robert W. Keyes,* 88 Civ. 6049. Further, although one of the defendants, Francis Santangelo, *Fidelity Bank v.* *Santangelo,* 88 Civ. 6060, is represented by his own attorney, I will assume for the purposes of this motion that his lawyer has joined in the papers of the Piken firm.

2. "PX" connotes a plaintiff's exhibit; "DX" a defendant's exhibit.

of Mutual Fire, who referred him to the Industrial Valley Bank (IVB), which allegedly was Mutual Fire's bank and had close ties with Mutual Fire, including a CEO who sat on Mutual Fire's board of directors. As discussed below, the timing of these discussions is in dispute. IVB issued a commitment letter for a bridge loan to Deep Creek on March 24, 1986, the same day that Mutual Fire issued its commitment letter. (DX G)

Meanwhile, Spolyar and broker-dealers sold units in the partnership to various investors, who executed promissory notes payable to Deep Creek in five installments; apparently, investors were led to believe that these notes were meant only as collateral that would enable the partnership to borrow funds. If this project was set up as most such projects are, it presumably would generate enough revenue so that the investors would not have to use their own funds to pay the installments on the notes. The surety bond issued by Mutual Fire guaranteed these notes.

On June 27, 1984, IVB and Deep Creek entered into a term loan agreement under which Deep Creek executed a note payable to IVB in five installments and assigned the investor notes to IVB as partial security for the loan. (PX D, E) As part of the term loan agreement, Deep Creek warranted that the "collateral documents," which included the investor notes, "when delivered will be valid, binding and enforceable in accordance with their respective terms." (PX D § 5.01(D))

In 1985, Mutual Fire became insolvent, and has been in a rehabilitation proceeding under Pennsylvania's insurance insolvency laws since December 8, 1986. The parties to the case at bar characterize the timing of the Deep Creek and investor defaults differently, but it is clear that Deep Creek defaulted on its note to IVB, that all defendants except two failed to make payments on the investor notes to Deep Creek, assigned to IVB and due on January 15, 1987, and that all defendants failed to make payments due January 15, 1988. (Styer Aff. at ¶ 15) Some defendants also failed to make the payments due under their notes on

January 15, 1985 and January 15, 1986; IVB made demand on Mutual Fire, and received payment for these amounts under the surety bond. Plaintiff does not seek to recover these amounts.

On June 13, 1986, Fidelity Bank acquired IVB's interests in certain commercial paper, including the investor notes here at issue, as part of an asset transfer accompanying a merger of the two banks. (DX I) On the very same day, Mutual Fire, now insolvent, came under a supervision order by the Commonwealth of Pennsylvania. On June 20, 1986, IVB and Fidelity Bank executed an Agreement to Merge, and on September 15, 1986, the merger became effective. (DX J,K) Fidelity Bank now asserts its rights as a transferee of the notes from IVB to collect the payments due on the investor promissory notes in the amounts listed in plaintiff's Exhibit G.

## II.

A federal court deciding a diversity case applies the same choice of law rules as the state courts of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This is a diversity case, so New York choice of law rules dictate which law governs.

The notes at issue here provide that they "shall be construed in accordance with the law of the State of Oregon." Although Oregon, like New York, has adopted the Uniform Commercial Code, and although the parties here refer to only one Oregon case and otherwise cite New York law, it is necessary under New York choice of law rules to follow the intention of the parties as to choice of law, as reflected in the signed instrument. Under New York choice of law principles, the "contractual selection of governing law is generally determinative so long as the chosen state has sufficient contacts with the transaction, absent fraud or violation of public policy." *Capital National Bank of New York v. McDonald's Corp.*, 625 F.Supp. 874 (S.D.N.Y.1986). *See Hawes Office Systems, Inc. v. Wang Labs, Inc.*, 537 F.Supp. 939 (E.D.N.Y.1982). Further, U.C.C. § 1–105 provides that "when a transaction bears a

reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Here, although Oregon arguably has few contacts with the transaction at issue, it was the site of the property and timber that the limited partnership was created to exploit. Further, because Oregon, New York and Pennsylvania all have adopted the Uniform Commercial Code, it is unlikely that either New York or Pennsylvania would have a policy that would override the choice of law provision.

Although both New York and Oregon have adopted the U.C.C., "states may provide varying interpretations of uniform statutes." *Lund's Inc. v. Chemical Bank*, 870 F.2d 840, 845 (2d Cir.1989). Therefore, when possible, this opinion must be based upon interpretations of Article 3 of the U.C.C. as explicated by Oregon courts. *See* ORS ch. 73. Inasmuch as Oregon has been the site for few reported disputes over the interpretation of the U.C.C.'s holder in due course provisions, I have found it necessary to refer to New York courts' interpretations of the U.C.C. to fill several gaps.

### III.

Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S.

654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), *cited in Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987). Nonetheless, in order to defeat a motion for summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Defendants here concede that they signed the promissory notes and that they defaulted on payments due under the notes. Thus Fidelity, as a holder of the signed instruments, is entitled to recover on them unless defendants establish a defense. U.C.C. § 3–307(2) (ORS 73.3070(2)) Defendants assert as their defense fraud in the limited partnership transaction. As discussed below, some of these defendants present evidence of fraudulent inducement sufficient to create a genuine issue as to this defense, and thus to defeat this summary judgment motion insofar as Fidelity asserts only the rights of a holder.

If a party establishes defenses, the burden then shifts to the holder to prove that it is not merely a holder but a holder in due course. U.C.C. § 3–307(3) (ORS § 73.3070(3)). *See Community Bank v. Ell*, 278 Or. 417, 564 P.2d 685, 688 (1977). If Fidelity is a holder in due course, it may collect on the notes regardless of defendants' fraud defense; under the U.C.C., a holder in due course acquires a negotiable instrument free of all claims by any person, and all defenses of any party to the instrument with whom the holder has not dealt, except for five statutory exceptions not implicated in this case.[3] U.C.C. § 3–305 (ORS § 73.3020–73.3050). *See Hobgood v.*

---

**3.** The defenses which a person may assert against a holder in due course are:

"(a) infancy, to the extent that it is a defense to a simple contract; and

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as has induced the party to sign the instrument with neither knowl-

edge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument." U.C.C. § 3–305(2).

*Sylvester,* 242 Or. 162, 408 P.2d 925, 927 (1965).

As set forth below, defendants have presented evidence from which a rational trier of fact could conclude that there was fraud in the inducement; thus, Fidelity must show that it is a holder in due course not subject to this defense in order to prevail on its summary judgment motion as to defendants allowed to use this defense. Because there is a material issue as to Fidelity's holder-in-due-course status, however, this action must go to trial as to those defendants who may assert the fraud defense.

### IV.

Defendants allege that the limited partnership units for which the investor-defendants executed the promissory notes at issue were sold and proposed through "a variety of fraudulent means." (Def.Mem. at 22) As discussed below, the PPM said that all financing for the transaction had been obtained, while in fact the financing was not finally assured until months after the PPM was issued.

· Defendants assert also that the surety company's mortgage on all the Deep Creek properties was not disclosed in the PPM. Further, defendants assert that Spolyar could not get the minimum number of investors he needed to preserve the offering, and therefore arranged for nearly half the units to be purchased by insiders, including two well-respected brokers whose units he personally guaranteed and whose names he then used to endorse the deal without disclosing the risk-free nature of their investment. ·

Still further, the partnership offering supposedly was exempt from the requirements of the Securities Act of 1933 under § 4(2), which exempts "non-public" offerings, and pursuant to Regulation D, which provides certain criteria for exempt offerings.[4] Defendants contend that some of the investors who participated in this offering were not "accredited investors" under Regulation D, thus rendering the entire transaction voidable. Defendants are vague, however, about the basis for the last of these claims, as Rule 506 under Regulation D does not require that all investors be accredited, but rather permits up to 35 non-accredited investors to participate. On pages 15 and 16 of the PPM, potential investors are advised that they must meet the requirements of Regulation D, either by showing that they are accredited investors or that they have the requisite "knowledge and experience." (PX C) Assumably, defendants are alleging that more than 35 investors were unaccredited, or that the issuer knew that the unaccredited investors were not sophisticated. Defendants, however, present no evidence to support this defense.

In order to establish fraudulent inducement, defendants must show: (1) a representation of a material fact; (2) falsity; (3) intent to deceive or knowledge by the party making the representation that it·is false, or reckless disregard as to whether the representation is true or false; (4) justifiable reliance by the person to whom the representation is made; and (5) damages. *See Riley Hill Gen. Contr. v. Tandy Corp.,* 303 Or. 390, 737 P.2d 595, 604–5 (1987). *See also Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67

---

**4.** The "safe harbor" provision of Rule 506 in Regulation D provides an exemption for limited offers and sales without regard to dollar amount when there are no more than 35 non-accredited investors pursuant to 17 C.F.R. § 230.502, and requirements such as limitations on advertising are met. 17 C.F.R. § 230.506. Further, the issuer must reasonably believe that each purchaser who is not an accredited investor "has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." 17 C.F.R.

§ 230.506(b)(2)(ii). For a natural person to be an accredited investor, he or she must have individual net worth, or joint net worth with that person's spouse at the time of purchase of over $1 million or must have had an individual income over $200,000 in each of the two most recent years or joint income with that person's spouse over $300,000 in each of those years and have a reasonable expectation of reaching the same level of income in the current year. 17 C.F.R. § 230.501(a)(4) and (5). *See* Loss, *Fundamentals of Securities Regulation* § 5E(2) at 324–27 (2d ed.1988).

L.Ed.2d 109 (1981). Under *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513, the court must consider the evidence on a summary judgment motion "through the prism of the substantive evidentiary burden," which on a fraud claim is proof by clear and convincing evidence.[5] *Riley Hill Gen. Contr.*, 737 P.2d at 604. *See also Rudman v. Cowles*, 30 N.Y.2d 1, 9, 330 N.Y.S.2d 33, 39, 280 N.E.2d 867, 871 (1972).

Three of the defendants have submitted affidavits describing circumstances of the limited partnership offering which, when read in the light most favorable to non-movants, strongly suggest that the Deep Creek partnership offering was permeated by fraud. George Parry, a broker/dealer at Rooney Pace, Inc., explained in his affidavit that Spolyar told him that two well-respected brokers—Norman Pessin and Carl Doerge—had purchased units of the partnership, but did not inform him either that Spolyar himself had guaranteed these interests or that most of the units of the partnership were bought by "insiders."

"I was not aware at the time, that so many people affiliated or related to the Private Placement Memorandum had in fact purchased same, and had I been aware, I certainly would have been much more reticent [*sic*] to enter into this transaction. I also would not have touted same to my clients and customers, nor would I have represented to them that some very sophisticated and knowledgeable Wall Street people had purchased same in their own right. I was misled by Mr. Spolyar and deceived by him into believing that these limited partners who were already 'on board' purchased same out of a sense of enthusiasm, rather than out of a sense of no risk or pecuniary gain on their part."

(Parry Aff. at ¶ 3) Parry listed in his affidavit 13 investors, now defendants, to whom he personally sold partnership interests as a result of his misconceptions about the offering.

Norman Pessin, a partner of the investment firm Neuberger & Berman, and Carl Doerge, an executive at Smith Barney, confirmed in their affidavits that in a desperate attempt to prevent the contingent offering from falling through, Spolyar, "in an impassioned plea, urging me to make such an investment, offered to me his personal guarantee that under no circumstances would I ever be called upon to pay any of the notes and in the event that there was a call made on any of the notes, he would personally pay them in my behalf." (Pessin Aff. at ¶ 4; Doerge Aff. at ¶ 4) These guarantees are attached to the affidavits. A list of defendant-investors in this case confirms that many of the people who bought units in the partnership were "insiders": Spolyar, his brother, his lawyers, Riebling—the President of Surety Intermediaries, which found a surety for Deep Creek—broker/dealers and the two people whose interests Spolyar personally guaranteed. Although the "insider" status of these investors does not necessarily reflect improprieties in the deal, Spolyar's representations that many of the units already had been sold, like his representation that Pessin and Doerge had purchased units, created the misperception in potential purchasers that many savvy Wall Street people were in effect endorsing the deal. The guarantees and the relationships among many of the investors were allegedly material facts that the issuer of partnership interests did not disclose to the other investors. There is thus a genuine issue as to defendants' fraud defense.[6]

---

**5.** Under Oregon law, however, although fraud must be proved by clear and convincing evidence, "the extent of damages need only be proved by a preponderance of the evidence." *Riley Hill Gen. Contr.*, 737 P.2d at 606.

**6.** In their answers, defendants assert as another affirmative defense that they were induced to invest in the partnership through misrepresentations that violated the Securities Act of 1933 and the Securities and Exchange Act of 1934. De-

fendants claim in their brief that Spolyar's omissions violated Rule 10b–5 under the Securities and Exchange Act of 1934 and other SEC Rules. (Def.Mem. at 22) Other than this passing mention, however, defendants have not briefed this securities fraud defense. Thus, I will not address it on this motion, except to note that if they can prove the misrepresentations as part of their common law fraud defense, they may be able to prove various violations of the 1933 Act (*i.e.*, § 12(2)) and the 1934 Act (*i.e.*, § 10(b)),

Defendants, however, have adduced evidence of a genuine issue of material fact as to only one of the two alleged misrepresentations in the PPM. Although the timing and order of financing commitments remains murky, there is a genuine issue as to whether the PPM's statement that the partnership had obtained financing was a material misrepresentation. On the other hand, as set forth below, defendants' allegation in the affidavits of Parry, Pessin and Doerge,[7] that the PPM materially omitted to mention that Mutual Fire was granted a mortgage on the partnership's property does not create an issue that survives this summary judgment motion, because evidence of neither falsity nor materiality has been presented.

The PPM sets forth the partnership's intention initially to finance the $5.3 million cost of the property through an institutional mortgage loan secured by "the business assets of the Partnership and the per annum assignment to the lender of the Investor Promissory Notes, Investor Bond and the proceeds of the Credit Life Insurance policies." (PX C at 4) The PPM states that the partnership has obtained a "firm commitment from Mutual Marine & Inland Insurance Co. [*sic*] an institutional lender for this loan as of the date of this Memorandum." (PX C at 4) On the next page, the PPM states that the "Mortgage Loan"— presumably the same loan as described above—"will be *secured by a first mortgage lien* on the Property acquired, as well as by the Investor Promissory Notes, Investor Bond and the proceeds of the Credit Life Insurance policies." (PX C at 5) (emphasis added) The PPM appears to be silent as to any collateral pledged to the surety for the bond, stating only that limited partners will pay for their units in part with promissory notes, and that the partnership will obtain an "Investor Bond to protect against the Investor's default in payment

of such note.... The Partnership has arranged for the Mutual Fire, Marine & Inland Insurance Co. to issue the Investor Bond.... The cost of the Investor Bond, which is estimated at 1.5% per annum of the outstanding amount of the Investor Promissory Notes, will be borne by the Partnership." (PX C at 2)

The evidence submitted on this motion leaves gaps in the information necessary to an understanding of the details of the transaction as it actually occurred. The only evidence presented as to Mutual Fire's alleged agreement to fund the transaction if the partnership could not find alternative financing is a letter dated March 16, 1984 from the Treasurer of Mutual Fire to the Deep Creek partnership. This letter represents an

> "unconditional commitment to [the partnership] to fund a $5.3 million dollar permanent financing loan ... secured by a first mortgage lien against all Partnership real property and further secured by Surety Bond ... dated March 7, 1984, issued by Mutual Fire Marine and Inland Insurance Company.... We agree to fund the Loan within 60 days of the date hereof if, for whatever reason, the Industrial Valley Bank and Trust Company ("IVB") elects not to fund such permanent financing, and further agree that if we are unable or refuse to fund the Loan within such period, we hereby waive whatever rights we may have, if any, as subrogee or assignee, to IVB's rights under that Demand Note dated March 16, 1984, by Deep Creek Timber Associates–I in favor of IVB."

(DX H) The Demand Note referred to in that letter in favor of IVB, presented as defendants' Exhibit G and also dated March 16, 1984, reflects IVB's agreement to provide a temporary loan to Deep Creek pending a possible agreement as to long-

---

assuming that the partnership interests here involved were securities. *See* Securities and Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10). *See also, e.g., Reves v. Ernst & Young,* —— U.S. ——, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

7. These affidavits state that "while the bank did not hold a mortgage on the property, the surety company, Mutual Fire, was granted a blanket mortgage on all of the properties. This additional collateral was not disclosed in the Private Placement Memorandum and I believe is a significant Securities Act breach."

term financing. The letter states that the partnership has "agreed to deliver to [IVB] mortgages and other instruments creating liens against certain of your assets." (DX G) The only other evidence presented as to the financing of the transaction is the IVB–Deep Creek loan agreement and assignment of the promissory notes, (PX D, E) executed on the date of the closing, June 27, 1984, and the affidavits of the surety broker, the Treasurer of Mutual Fire, and the loan officer at IVB who was involved in the transaction.

Defendants thus fail to present evidence showing that—as alleged in the Parry, Pessin and Doerge affidavits—the surety was granted a mortgage on the partnership properties. In fact, the terms of any final agreement between Mutual Fire and the partnership are not presented anywhere in the evidence; the March 7 surety bond referred to in Mutual's March 16 commitment letter is nowhere to be found among the exhibits. Also, because the PPM stated that the loan to Deep Creek would be secured by a mortgage, any misrepresentation that one institution instead of the other held the mortgage does not seem to be material. Defendants thus have failed to present a genuine issue as to misrepresentations about mortgages.

However, defendants have presented a genuine issue as to the representation in the PPM about financing; the wording of Mutual Fire's commitment letter in March implies that this was the first time Mutual was committing to such financing, and the conflicting affidavits as to when and how financing was obtained create an issue as to whether the PPM's statement about financing was an intentional misrepresentation at the time it was made. In his affidavit, Peter Riebling, a limited partner of Deep Creek and the president of Surety Intermediaries, explained that:

"From the time of the commitment letter in March of 1984, Mr. Spolyar, upon information and belief, actively pursued 'selling' of his proposal to New York banks in an attempt to secure financing. The commitment from Mutual Fire was for the surety bond and he was now attempting during this timeframe to se-

cure the actual funding. Some time in late May or early June of 1984, Mr. Spolyar then contacted me, indicating to me that the New York banks had reached their 'limit' on Mutual Fire surety bonds and that he was unable to secure the financing. Mr. Spolyar acknowledged this to me in a telephone conversation and requested my help and guidance in securing his financing. I indicated to him that he should 'call Jack Matlack' [of Mutual Fire]."

(Riebling Aff. at ¶ 7) Riebling's affidavit avers that Mutual Fire committed only to the surety bond. Although this understanding is contradicted by Mutual Fire's commitment letter of March 16 (DX H), the two month lag between the PPM and the commitment letter, in light of Riebling's affidavit, highlights an issue as to whether Mutual Fire had agreed to finance the deal at the time the PPM was issued in January, 1984.

In their affidavits, both Jerome Witkowski, the Treasurer of Mutual Fire, and Jack Matlack, the President of Mutual Fire, state that at no time while they were at the company did Mutual ever make any loans or commit to making any loans to any company. (Witkowski Aff. at ¶ 2; Matlack Aff. at ¶ 4). Further, Witkowski explains that when Riebling told him that Spolyar was having trouble obtaining financing, Witkowski contacted Frank Spewok, a loan officer at IVB and introduced Spolyar and Spewok to one another. (Witkowski Aff. at ¶ 6)

"Mutual Fire and the Industrial Valley Bank had a special and very close relationship during this period of time, and it is on that basis that I made the introduction of Mr. Spolyar to our bank with the expectation that the bank could arrange the financing and facilitate the closing of the transaction. Mutual Fire had a direct financial stake in the financing being arranged via earned premiums and on information and belief, my introduction to our bank, the Industrial Valley Bank, directly brought about the placing

of the financing and the closing of the transaction."

(Witowski Aff. at ¶ 9)

Thus, there is evidence that when the PPM was issued in January, 1984, the partnership had not obtained financing from a bank, despite the statement in the PPM that firm commitment for financing had been obtained. According to Spewok and Mutual Fire's commitment letter, there was an understanding between Spolyar and Mutual Fire that Mutual would provide both the surety bond and the actual financing. (DX H, Q) But the fact that the partnership contacted IVB about financing the transaction, and allegedly considered such financing from IVB necessary in order to close the deal, casts enough doubt on the terms of any agreement with Mutual Fire to raise an issue about the accuracy of the PPM with regard to financing at the time it was issued.

Such a misrepresentation could form the basis of a fraudulent inducement defense although financing eventually was obtained, because defendants have submitted evidence that the ability of the partnership to obtain financing was a material fact,[8] that the issuer of the units intentionally made this misrepresentation, that defendants relied on this representation—among others—in buying the units, and that they were damaged as a result of this purchase. *See Riley Hill Gen. Contr.*, 303 Or. 390, 737 P.2d at 604–5. Defendants have shown the necessary reliance through the affidavit of a broker, George Parry, who asserts that had certain facts about the transaction been disclosed to him, he would not have invested, nor advised clients to invest. Parry asserts in his affidavit that had he known, *inter alia,* that Pessin's and Doerge's units were personally guaranteed, and that financing had not yet been obtained at the time the PPM was issued, he would not have invested nor advised 13 of the other defendants to purchase the units. (Parry Aff. at ¶¶ 3,4,5,7) Therefore, defendants have demonstrated a genuine issue of material fact as to their reliance on the

alleged misstatements. *See National Union Fire Ins. v. Cooper,* 1990 WL 55690, 1990 U.S. Dist. Lexis 4878 at *11–12 (S.D. N.Y. April 26, 1990).

If Fidelity is not a holder in due course, then it cannot collect on the notes if defendants prove that the promissory notes were procured by fraud. Under the U.C.C., a holder other than in due course takes the instrument subject to all valid claims and all "personal" defenses—among other things, "all defenses of any party which would be available in an action on a simple contract." U.C.C. § 3–306. Fraud in the inducement is one of these defenses: "a party may not compel performance of an agreement which that party has induced by fraud." *National Union Fire Ins. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989). *See Bonds v. Landers,* 279 Or. 169, 566 P.2d 513 (1977); *Cooper,* 1990 WL 55690, 1990 U.S. Dist. Lexis 4878 at *8–9. The evidence produced so far establishes at least that the defense of fraud in the inducement, if not precluded by Fidelity's holder-in-due-course status, should be evaluated by the fact finder and not disposed of on this summary judgment motion.

## V.

Not all defendants here, however, may assert the defense of fraud in the inducement. Of the 37 defendants in these 37 unconsolidated cases, plaintiff alleges that at least ten in some way were involved in the fraud asserted as a defense by defendants as a group. Plaintiff does not contest that the other 27 defendants may assert the defense of fraud, and as demonstrated above, defendants have raised a genuine issue as to fraudulent inducement to permit this case to go to trial if Fidelity cannot assert the rights of a holder in due course.

■ A party cannot rely on his or her own fraudulent conduct as a defense to an

---

**8.** Indeed, defendants point out that a representation that financing has been pre-arranged is crucial, as illustrated by the 1983 Deep Creek offering, in which the PPM made no representation as to financing, which did not sell and had to be aborted. (Def.Mem. at 14)

obligation.[9] "Courts will not aid a person 'who founds his cause of action upon his own immoral or illegal act.'" *Bankers Trust Co. v. Litton Systems*, 599 F.2d 488, 492 (2d Cir.1979) (quoting Restatement of Contracts § 598, comment (a) (1932)). *See also Stuart v. Tomasino*, 148 A.D.2d 370, 539 N.Y.S.2d 327, 331 (First Dep't 1989).

 Further, as discussed above, in order to show fraudulent inducement, defendants must establish, *inter alia*, that they justifiably relied on a representation about a material fact. *Mallis*, 615 F.2d at 80. Because fraud must be proved by clear and convincing evidence, *Riley Hill Gen. Contr.*, 737 P.2d at 604, the court on a summary judgment motion must "bear in mind the actual quantum and quality of proof necessary to support liability" and view the evidence through the prism of this higher substantive burden. *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513.

As discussed *supra*, Section IV, the "innocent" defendants here presented sufficient evidence of misrepresentations with regard to the Deep Creek transaction to survive plaintiff's summary judgment motion. Although the only evidence of these defendants' reliance was Parry's affidavit, one could assume that if this broker relied upon material misrepresentations, then other defendants, many of whom were Parry's clients, also relied upon such misrepresentations. But that presumption of reliance, without the support of affidavits or any evidence whatsoever, cannot apply to the defendants who aided the issuer in putting together the transaction, especially those with access to documents evidencing whether financing in fact had been obtained, and those in a position to question the issuer about details of the transaction. The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Certain "insider" defendants did not submit affidavits or evidence to support essential elements of a fraud defense, and thus do not raise an issue as to plaintiff's right to collect the debt defendants owe on notes held by plaintiff.

 Four of those defendants were attorneys at the firm of Rosen, Hacker & Nierenberg, which prepared the PPM and opinion letter regarding the sale of units in the limited partnership, and acted as special counsel to the partnership in connection with the loan agreement with IVB. In the opinion letter accompanying the PPM, the law firm recited that it had acted "as co-special counsel to you in connection with the offering of limited partnership interests in Deep Creek Timber Associates–I," and explained that in preparing to write this letter, the firm examined, among other things, "[s]uch other instruments and documents in connection with the formation and organization of the Partnership and

---

**9.** This doctrine is analogous to the *in pari delicto* defense, which holds that when a plaintiff and defendant are equally at fault, the "defending party is in the stronger position.... Generally translated, it means the plaintiff should not therefore recover, and the parties should be left where they are. This view is predicated on the principle that to grant plaintiff relief would contravene the public good by aiding one to profit from his own wrong." *Ross v. Bolton*, No. 89–7662, 904 F.2d 819, 824, (2d Cir.1990). In *Ross*, the Second Circuit followed the Supreme Court's test set forth in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), for the proper scope of the *in pari delicto* defense in securities litigation, which provides that the defense could bar a plaintiff's suit if: (1) plaintiff truly bears at least substantially equal responsibility for the transactions for which he seeks to recover, and (2) barring the suit will not "significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Ross*, 904 F.2d at 825, (quoting *Berner*, 472 U.S. at 310–11, 105 S.Ct. at 2628–29).

Although in the case at bar it is plaintiff who asserts that a party cannot profit from his or her own wrongdoing, the Second Circuit's approval of the *in pari delicto* defense in securities fraud cases supports a decision here to grant summary judgment against defendants whose purchase of units "was not an investment made pursuant to an arms-length transaction, but an attempt to profit from a 'sure thing.'" *Ross*, 904 F.2d at 825.

the *acquisition and financing* of the Business as we have deemed necessary or appropriate for the purposes of this opinion." (PX C) (emphasis added) Absent any evidence that these lawyers were misled by the issuer—and they have submitted none—this court cannot simply presume that the attorneys who worked with the issuer relied on the PPM's alleged misrepresentations about financing, or that they bought units based on the misperception that savvy Wall Street investors had deemed the partnership a wise investment.

Further, as discussed below, defendants must show that IVB had notice or knowledge of a defense to the notes or took the notes in bad faith in order to prove that IVB was not a holder in due course. In June, 1984, the law firm wrote an opinion letter addressed to IVB, explaining that the firm acted "as special counsel to the Partnership in connection with the Term Loan Agreement dated June 27, 1984 ... between the Partnership and Industrial Valley Bank and Trust Company." (DX F) Of course, this letter was replete with disclaimers that the law firm did not investigate or know whether material adverse changes in the partnership occurred which were not disclosed to the limited partners. (DX F at 4) Nevertheless, the attorney-defendants inflict mortal wounds on themselves when they assert that the transaction was fraudulent and that IVB knew about such fraud, because these lawyers themselves assured the bank at the time the loan agreement was signed that they knew of no misrepresentations.

Therefore, plaintiff's motion for summary judgment is granted in the following cases: (1) *Fidelity Bank v. Robert J. Rosen*, 88 Civ. 6062; (2) *Fidelity Bank v. Jonathan S. Hacker*, 88 Civ. 6057; (3) *Fidelity Bank v. Stuart M. Nierenberg*, 88 Civ. 6059; (4) *Fidelity Bank v. Valerie E. Ebert*, 88 Civ. 6055.

■ Plaintiff argues that Parry, Taylor, Pessin and Doerge, as well as Riebling and John Spolyar, James Spolyar's brother, all were "insiders" who cannot rely on the defense of fraudulent inducement to avoid payment on their promissory notes. Certainly Riebling, as the attorney-in-fact for Mutual Fire and the person who sent the PPM to Mutual Fire, and who helped Spolyar contact IVB when he could not get financing from New York banks, cannot assert that he relied on misrepresentations in the PPM—misrepresentations in effect as to his own activities. In fact, he admits that many of the units purchased by limited partners were purchased by insiders, including the broker/dealers involved in selling the PPM "and myself." (Riebling Aff. at ¶ 8)

However, as his defense, Riebling asserts that if he had known of the personal guarantees given to two of the limited partners, he would have "reassessed my entire position in the transaction or requested a similar guarantee." (Riebling Aff. at ¶ 9) It is debatable, given his early involvement with the deal, whether Riebling could prove reliance on the misperception engineered by Spolyar that savvy investors had purchased units. But the timing of the various defendants' purchases of notes is unclear, and it is possible that Riebling bought his interest only after Pessin and Doerge bought theirs. Because it would be possible for a fact finder to conclude that Riebling was fraudulently induced into buying units, plaintiff's motion for summary judgment in *Fidelity Bank v. Peter Riebling*, 88 Civ. 6058, is denied.

John Spolyar—the brother of the president of the corporate general partner—allegedly was one of the insiders who purchased units in order to prevent the deal from falling through for failure to meet the requisite number of purchasers. (Riebling Aff. at ¶ 8, Parry Aff. at ¶ 3, Pessin Aff. at ¶ 6, Doerge Aff. at ¶ 6) John Spolyar has not submitted an affidavit raising issues of fact as to his reliance on his brother's alleged misrepresentations in face of these characterizations of him by his co-defendants. Thus, because this defendant has raised no genuine issue of fact as to whether he was fraudulently induced into signing his promissory note, plaintiff's motion for summary judgment is granted in *Fidelity Bank v. John Spolyar*, 89 Civ. 0875.

■ Carl Doerge, an executive at Smith Barney, asserts in his affidavit that "had I been aware that these 'inside units' were being accounted for in such a manner, I would surely have had second thoughts about making even the initial investment which I did make. In addition thereto, had Mr. Spolyar not personally guaranteed my future indebtedness, I most assuredly would not have invested or once I learned of same, would have voided my transaction." (Doerge Aff. at ¶ 6) Pessin makes the same contentions. (Parry Aff. at ¶ 6) They both admit that Spolyar used their supposed endorsement of the investment to convince others to invest without disclosing the personal guarantees, but contend that they knew nothing about this selling tactic. That these two men would not have invested in the partnership if Spolyar had not guaranteed their investments belies any affirmative defense they may assert that they were fraudulently induced to buy the units. Apparently, they were induced into purchasing units solely by the seemingly no-risk nature of paying for the investment with guaranteed notes. Pessin and Doerge thus fail to raise a genuine issue of material fact as to their reliance on the alleged fraudulent representations discussed above. Therefore, plaintiff's motion for summary judgment is granted in *Fidelity Bank v. Norman Pessin*, 88 Civ. 6063 and *Fidelity Bank v. Carl Doerge*, 88 Civ. 6047.

■ George Parry, who has submitted an affidavit on this motion, and Francis M. Taylor, who has not, are both broker-dealers who sold units in the partnership and bought such units themselves. Plaintiff argues that these broker-dealers used the allegedly misleading information to sell units to their clients, and therefore cannot assert the defense of fraud to evade payment on their notes. Parry's affidavit, however, raises a genuine issue as to whether or not he bought (and sold) units in the partnership because of the misrepresentations and omissions of James Spolyar.

Parry asserts that he did not know that Pessin's and Doerge's interests in the partnership were guaranteed, nor did he know how many "insiders" had purchased units. (Parry Aff. at ¶ 3) He states also that he was unaware of the alleged misrepresentations in the PPM, and plaintiff submits no evidence that a mere seller of the units would have reason to know of such misrepresentations. Parry contends that he would not have been as willing to buy or sell the units had he been apprised of the details of the transaction. (Parry Aff. at ¶ 3) Although Taylor does not submit an affidavit on this motion, he assumably was in the same position as Parry; indeed, Pessin in his affidavit explains that "the sales people involved, Mr. Taylor and Mr. Parry, were apparently given this information by Mr. Spolyar and no word of the personal guarantee was ever made. Thus, Parry and Taylor became unwitting dupes of Spolyar's misrepresentations." (Pessin Aff. at ¶ 8)

Because there is a genuine issue of material fact as to whether Parry and Taylor may assert the defense of fraud, and because, as discussed below, there is an issue as to Fidelity's rights as a holder in due course, plaintiff's motion for summary judgment is denied in the cases *Fidelity Bank v. George Parry*, 88 Civ. 6050 and *Fidelity Bank v. Francis Taylor*, 89 Civ. 0870.

## VI.

### A. *Fidelity as Holder in Due Course*

A holder in due course is a holder who takes the instrument: "(a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." U.C.C. § 3–302(1) (ORS § 73.3020(1)). Defendants assert that Fidelity is not a holder in due course because it took the notes with notice that they were overdue. Defendants have submitted a letter from IVB to Spolyar—dated a year before Fidelity received the notes—notifying him, *inter alia*, that the limited partnership notes were in default. (DX C) This letter creates at least an issue of fact as to Fidelity's status as a holder in due course; indeed, plaintiff concedes in its memorandum that "Fidelity Bank does not

claim to be a holder in due course in its own right." (Pl. Reply Mem. at 4)

Instead, Fidelity argues that it derives its right to enforce the notes as a transferee from IVB, which Fidelity alleges was a holder in due course. Section 3–201(1) of the U.C.C. (ORS 73.2010(1)) codifies the so-called "shelter rule," whereby transfer "of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course." Thus, the transferee itself need not be a holder in due course in order to assert the rights of a holder in due course. *See Perry & Greer, Inc. v. Manning*, 282 Or. 25, 576 P.2d 791, 794 (1978); *Turtur*, 892 F.2d at 205.

Defendants assert that Fidelity does not succeed to IVB's holder-in-due-course status for two reasons: (1) the transfer of the notes from IVB to Fidelity was suspect; and (2) IVB was never a holder in due course, because it had notice of defenses to the notes and did not take the notes in good faith. As set forth below, defendants do not adduce enough evidence of a tainted transfer to defeat summary judgment on that ground, but they do raise a genuine issue of material fact regarding IVB's good faith and notice such that a rational fact finder could conclude that IVB was not a holder in due course.

B. *The Transfer from IVB to Fidelity*

█ Defendants allege that the transfer of the notes preceded by three months the merger between IVB and Fidelity, and was a bulk transfer of instruments not in IVB's regular course of business. Section 3–302(3)(c) of the U.C.C. provides that a holder of an instrument does not become a holder in due course by "purchasing it as part of a bulk transaction not in regular course of business of the transferor." The Official Comment to that section explains that the section applies "to a reorganized or consolidated corporation taking over in bulk the assets of a predecessor. It has particular application to the purchase by one bank of a substantial part of the paper held by another bank which is threatened with insolvency and seeking to liquidate its assets." U.C.C. § 3–302 comment 3(c) (1962). *See National Bank of Rochester v. Erion–Hynes Realty Co.*, 123 Misc. 873, 206 N.Y.S. 452, *aff'd*, 213 A.D. 54, 209 N.Y.S. 522 (Fourth Dep't 1925).

Defendants contend that because the pre-merger transfer of notes was itself suspicious, they need further discovery "in order to ascertain the true nature of the 'merger' and the significance and purpose of the 'purchase' of these Notes prior thereto." (Def. Mem. at 11) Yet defendants have had a year since this motion was first briefed in which to conduct discovery, and have not unearthed evidence of a bulk transfer other than that the purchase agreement for the notes was signed before the final merger documents were signed.

Whether defendants are arguing only that the alleged bulk transfer prevents Fidelity from being a holder in due course in the first instance, or whether they are arguing also that it prevents Fidelity from acquiring IVB's holder-in-due-course status through a transfer, the bulk transfer issue is irrelevant to this motion. First, as discussed above, Fidelity concedes that it is not a holder in due course in the first instance. Second, the bulk transfer provision of U.C.C. § 3–302(3)(c) does not affect the "shelter rule" of § 3–201, and thus such a transfer would not prevent Fidelity from acquiring IVB's rights as a holder in due course. The bulk transfer provision only disqualifies the holder from attaining holder in due course status merely by meeting the other requirements of § 3–302, *i.e.*, by taking the instrument for value, in good faith and without notice. But if "the holder purchases the instrument from a holder in due course, then the holder would acquire the holder-in-due-course status of the seller by means of the 'shelter rule' of 3–201, even though he made the purchase at a judicial sale," or presumably, through a bulk transfer. White & Summers, *Uni-*

*form Commercial Code,* § 14–11 at 739 (3d ed. 1988).

Accordingly, Fidelity still would have acquired the rights of a holder in due course if IVB was such a holder.

### C. *IVB's Holder–in–Due–Course Status*

Defendants have adduced enough evidence casting doubt on IVB's holder-in-due-course status to create a genuine issue of material fact and thus preclude summary judgment. Defendants assert that IVB, as the bank which funded the limited partnership transaction, did not take the notes with good faith, and had notice that the transaction was based on misrepresentations and fraud.

A party challenging the good faith and lack of notice of a holder bears a substantial burden. *See Union Bank of India v. Seven Seas Imports, Inc.,* 727 F.Supp. 125, 130 (S.D.N.Y.1989). Complaints based on such allegations must be dismissed unless there exist "material issues of fact ... which are 'genuine and based on proof, not shadowy and conclusory statements.'" *First International Bank v. L. Blankstein & Son,* 59 N.Y.2d 436, 465 N.Y.S.2d 888, 892, 452 N.E.2d 1216, 1220–21 (1983) (quoting *Hogan & Co. v. Saturn Management,* 78 A.D.2d 837, 433 N.Y.S.2d 168, 169 (1980)). The appropriate standard for determining whether IVB took the notes in good faith or without notice of defenses such as fraud is a subjective one based on IVB's actual intent or knowledge rather than the intent or knowledge of an objectively reasonable bank. *Ell,* 564 P.2d at 691. *See also Chemical Bank v. Haskell,* 51 N.Y.2d 85, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339, 1340–41 (1980); *First City*

*Federal Sav. Bank v. Bhogaonker,* 684 F.Supp. 793, 797 (S.D.N.Y.1988). The U.C.C. defines "good faith" as "honesty in fact in the conduct or transaction concerned."[10] U.C.C. § 1–201(19) (ORS 71.-2010(19)). Section 3–304 of the U.C.C. describes matters that constitute notice to a purchaser of a negotiable instrument: "(1) The purchaser has notice of a claim or defense if ... (b) the purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged ... (7) In any event, to constitute notice of a claim or defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the instruments amounts to bad faith." Knowledge under the U.C.C. is defined as a person's "actual knowledge" of a fact. U.C.C. § 1–201(25).

Defendants' challenges to IVB as holder in due course boil down to two main arguments: (1) IVB and Mutual Life, the surety in the limited partner transaction, were so closely connected that any knowledge or notice that Mutual Life had of the fraud in the transaction should be imputed to IVB; and (2) IVB knew or had reason to know at the time it received the promissory notes as collateral for the limited partnership loan that misrepresentations and improprieties permeated the creation of the limited partnership.

### 1. *Close Connection Doctrine*

■ Although defendants posit an arguably valid legal theory when they argue that the relationship between IVB and Mutual Fire provides a basis for inferring IVB's notice of the fraud,[11] they adduce no evidence whatsoever that this close work-

---

**10.** Although bad faith requires actual subjective bad intent, the Oregon Supreme Court has held that "mere negligence or failure to make the inquiries which a reasonably prudent person would make does not of itself amount to bad faith, [but] if a party fails to make an inquiry for the purpose of remaining ignorant of facts which he believes or fears would disclose a defect in the transaction, he may be found to have acted in bad faith." *Ell,* 564 P.2d at 691.

**11.** The theory that attributes notice to holders through the holder's close relationship with a

company that did have notice has been labeled the "close connection doctrine" by scholars of the Uniform Commercial Code. *See* 1 White & Summers, *Uniform Commercial Code* § 14–6 at 712–13 (3d ed.1988). *See also* 5 R. Anderson, *Uniform Commercial Code* § 3–302:26 (3d ed. 1984). This theory seems not to have been accepted by many courts, probably because it disregards the subjective standard of actual notice that has been codified in the Uniform Commercial Code. *See* U.C.C. § 1–201(25).

ing relationship gave rise to a sharing of knowledge about the transaction that would endanger IVB's holder-in-due-course status. Even courts that have avoided the subjective notice standard under the U.C.C. by imputing the knowledge of the one company to another closely connected holder have done so on the basis of evidence that the relationship was so close that the holder in effect was involved in the initial tainted transaction. *See Unico v. Owen,* 50 N.J. 101, 232 A.2d 405, 4 U.C.C. 542 (1967).[12] As discussed below, a close relationship with another company may facilitate the holder's actual discovery and notice of fraud in a transaction, but the close relationship alone cannot create an issue of the holder's notice.

Defendants assert that Mutual Fire was directly involved in the allegedly fraudulent limited partnership offering, and that knowledge "which Mutual Fire had, through its Board of Directors and/or its attorney in fact, can be imputed to the Industrial Valley Bank, by virtue of the fact that a member of the Board of directors of Mutual Fire was the Chairman of the board and Chief Operating Officer of Industrial Valley Bank." (Def. Mem. at 17) However, simply because the same person, Joseph Gallagher, sat on the boards of both companies does not mean that IVB automatically acquired Mutual Fire's knowledge, if any.

Although courts occasionally have used agency principles to impute the knowledge of an employee to the employer for purposes of notice, *see Emery–Waterhouse Co. v. R.I. Hosp. Trust Nat. Bank,* 757 F.2d 399, 406 (1st Cir.1985), they have done so when the employee was directly involved in the wrongdoing or obviously knew of such wrongdoing. Defendants here have not produced evidence that Gallagher knew information about the Deep Creek transaction which could be imputed to IVB. Thus,

any claim that he learned of improprieties while performing his duties as a director of Deep Creek's surety is mere conjecture and too speculative to create a genuine issue regarding IVB's notice of the alleged fraud. *See Bankers Trust Co. v. Litton Systems,* 599 F.2d 488, 491 (2d Cir.1979) (trial court properly found no proof that "there was a close relationship between Regent and the banks which justified a finding that the banks did not take the assignments in good faith and therefore were not holders in due course").

Further, it is well settled that a "director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation." *Weintraub v. Texasgulf Inc.,* 564 F.Supp. 1466 (S.D.N.Y.1983). Even if Gallagher did receive notice of possible fraud through his activities at Mutual Fire, such notice may not be imputed to IVB because it would not have been obtained in the scope of Gallagher's employment at IVB.

2. *Evidence of IVB's Actual Knowledge or Bad Faith*

Although the relationship between the bank and Mutual Fire does not provide a basis for *imputing* IVB's knowledge of the alleged fraud, defendants have submitted evidence that IVB had actual knowledge when it made the decision to finance the transaction that the promissory notes might be subject to the defense of fraud. Such evidence creates a genuine issue as to IVB's notice of the fraud and its good faith in taking the notes, and thus precludes summary judgment as to the liability of those defendants who were not themselves participants in the alleged fraud.

Under the U.C.C.'s subjective standard for good faith, "the existence of bad faith turns on whether the holder of the note knew that the transaction was suspect."

12. The New Jersey court in *Unico* explained that "when it appears from the totality of the arrangements between [seller] and financer that the financer has had a substantial voice in setting standards for the underlying transaction, or has approved the standards established by the [seller], and has agreed to take all or a predeter-

mined or substantial quantity of the negotiable paper which is backed by such standards, the financer should be considered a participant in the original transaction and therefore not entitled to holder in due course status." *Unico,* 232 A.2d at 417.

*Bhogaonker,* 684 F.Supp. at 797 (citing *Sundsvallsbanken v. Fondmetal, Inc.,* 624 F.Supp. 811, 817 (S.D.N.Y.1985)). If the bank "did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith [is] sufficiently shown." *Haskell,* 51 N.Y.2d at 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339. Further, although notice of a claim or defense must be actual notice and not the knowledge of a hypothetical reasonable person in the same situation, for "most purposes, there need be no connection between the defense or claim which the party on the instrument is attempting to assert and the flaw which allegedly deprives one of holder in due course status." White & Summers, *Uniform Commercial Code,* § 14–6 at 717–18. Thus, although defendants assert a number of different ways in which they were fraudulently induced to purchase limited partnership interests, evidence of IVB's knowledge about just one actionable misrepresentation is enough to create an issue as to its holder-in-due-course status.

In *Turtur,* which involved quite similar facts and issues, the Court of Appeals affirmed a decision to deny summary judgment on a bank's claim for reimbursement as an asserted subrogee of promissory notes. *Turtur,* 892 F.2d 199. In allowing defendants to raise at trial the defense that the bank was a party to the fraud under U.C.C. § 3–201, the district court expressed doubt as to the strength of defendants' evidence, but nonetheless gave them the opportunity to prove their case:

"The Turturs have barely raised a factual issue as to whether National Union was aware of the misstatements in the PPM before it issued the bond.... They allege that National Union was on notice of the fraud because its Vice President, Mr. Goldstein, had attended a seminar concerning computer equipment leasing transactions, where another Trupin enterprise—Chase Associates—was given as an example of problems with the structure of several computer equipment leasing partnerships. Whether the information Mr. Goldstein was exposed to, or the other information available to National Union, was sufficient to put it on notice that the PPM was fraudulent are questions on which the Turturs may not ultimately prevail, but they appear appropriate for resolution at trial rather than summarily."

*National Union Fire Ins. Co. v. Turtur,* 1988 WL 48695, 1988 U.S. Dist. Lexis 4252 at *9 (S.D.N.Y.1988), *quoted in Turtur,* 892 F.2d at 206. The Circuit Court agreed that although defendants "barely raised a factual issue" as to the bank's knowledge of misstatements in the PPM, such an issue precluded summary judgment. *Turtur,* 892 F.2d at 206.[13]

Here, defendants' evidence that IVB knew of misstatements in the PPM is not overwhelming, but it "barely" raises a factual issue as to IVB's holder in due course status; that issue should be resolved at trial. Defendants have submitted evidence suggesting that IVB knew that the section of the 1984 PPM explaining that financing had been obtained was false, and that IVB therefore may have been alerted to the fraudulent limited partnership scheme. As discussed above, the pertinent provision in the PPM provides that a firm commitment for the financing "has been obtained." (PX C at 5) Yet, IVB was not approached to finance the partnership until after the PPM already had been issued, and there is no evidence that Mutual Fire committed to the financing until March 16, 1984, two months after the PPM was issued. The PPM was dated January 10, 1984; IVB did not commit to a bridge loan until March 16, 1984

---

**13.** Plaintiff contends that *Turtur* is distinguishable because in that case, defendants established that the bank had reviewed the PPM which allegedly contained misstatements, *See Turtur,* 892 F.2d at 202, whereas here no such evidence has been presented. (Pl.Mem. at 12) Such an argument, however, is without basis in reality: it is virtually inconceivable that a bank committing to lend $5.3 million to a limited partnership would not have read the private placement memorandum that described to investors the transaction being financed. Although under the U.C.C. the standard is one of actual—as opposed to reasonable—notice of fraud, defendants have produced enough evidence to raise a genuine issue as to IVB's good faith and notice.

and Mutual Fire did not commit in writing to the back-up loan until then.

According to Witkowski, the Treasurer of Mutual Fire, when he heard that Spolyar was having trouble obtaining financing, he contacted Frank Spewok, a loan officer at IVB and introduced Spolyar and Spewok. (Witkowski Aff. at ¶ 6) Witkowski claims that he made the introduction "with the expectation that the bank could arrange the financing and facilitate the closing of the transaction." (Witkowski Aff. at ¶ 9) As discussed above, one cannot infer IVB's knowledge of misrepresentations from its connection with Mutual Fire alone. But the fact that an officer of Mutual Fire, the institution that supposedly was financing the transaction, contacted IVB to ask the bank to do the financing at least alerted IVB to the possibility that there was not already a commitment. A fact finder could conclude that a "commercially honest" bank would not take the notes under such circumstances. *See Haskell*, 51 N.Y.2d at 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339.

As discussed above, defendants have raised an issue as to a valid defense of fraudulent representation arising from statements in the PPM that financing was in place. That IVB eventually agreed to provide the financing does not wipe out a misrepresentation as to financing in the PPM if defendants can prove the elements of fraudulent inducement, and if IVB knew that the transaction was tainted by fraud at the time it took the notes.[14] This in turn raises an issue as to IVB's good faith, as such circumstances could lead a rational fact finder to conclude that IVB knew the transaction was suspect. *See Bhogaonker*, 684 F.Supp. at 797. In fact, in his deposition, IVB's loan officer revealed that he may have known that Mutual Fire was not supposed to make loans such as the one the PPM said it had committed to make:

"Q: If Mutual Fire had already committed to make this funding, what, if anything, was the purpose of his recommending Deep Creek to IVB?

A: ... [T]hey had understood from Jerry [Witkowski] that they had made the commitment to provide the funding to actually fund the loan, in addition to just providing the surety bond as part of a marketing effort. They wanted ... the surety bond business. It was attractive fee-related business to Mutual Fire, and, according to Jerry, somewhat competitive. In order to give a competitive edge, if you will, they agreed to ... provide, in effect, one-stop shopping. We will provide the surety bond. We will help to arrange the financing. If we cannot arrange the financing, we will provide the finance. But Jerry also pointed out to me, well, they would do that and they have the ability to do that and the equity to do that. *That's really not what they are ultimately supposed to be doing without any significant amount of money. Their insurance company is not supposed to be making loans, and they prefer not to have it on the books.*

Q: Do you know they were even authorized or licensed to loan money in the State of Pennsylvania or otherwise?

A: I don't know.

---

14. One could argue that because IVB eventually did finance the transaction, defendants could not show loss causation arising from the alleged misrepresentation and thus do not have a valid defense to the notes. This argument is not persuasive on a summary judgment motion. Although defendants may not at trial succeed in demonstrating the elements of fraud, including damages, they have presented enough evidence of such fraud to avoid summary judgment. A rational fact finder might conclude that had the "innocent investors" known that the deal was not yet financed, they would have realized that the transaction was not as valuable as represented, lost confidence in Spolyar and not bought the interests—in other words, that these defendants were injured by becoming involved in the deal in the first place. *See, e.g., Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), *explained in Bennett v. United States Trust of N.Y.*, 770 F.2d 308, 314 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986) ("[A]lthough the misrepresentation was not related to the intrinsic investment characteristics of the stock involved, it did directly relate to the investment quality of the stock because had the plaintiffs known that their 'broker' was a trainee who had no expertise, they would not have accepted his recommendations").

**240**

Q: You never made inquiry and were never asked to?

A: I don't recall ever having gotten into that."

(DX Q) (emphasis added) Although Spewok does not admit that he knew Mutual Fire could not do the financing, his confused testimony at least raises an issue as to his and other IVB employees' knowledge that the PPM's designation of Mutual Fire as the source for financing was false. *See Cooper*, 1990 WL 55690, 1990 U.S.Dist. Lexis 4878 at *14–15 (affidavits asserting that bank knew true financial condition of partnership raise issue as to good faith and knowledge).

In *Unico v. Owen*,[15] the New Jersey Supreme Court convincingly explained the purpose of holder-in-due-course status. This reasoning is equally applicable to explain the importance of allowing defendants the opportunity to try to prove IVB's —and thus Fidelity's—lack such status:

"The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. It would seem to follow, therefore, that the more the holder knows about the underlying transaction, and particularly the more he controls or participates or becomes involved in it, the less he fits the role of a good faith purchaser for value; the closer his relationship to the underlying agreement which is the source of the note, the less need there is for giving him the tension-free rights considered necessary in a fast-moving credit-extending commercial world."

*Unico*, 232 A.2d at 410.

In determining whether a genuine issue of material fact has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Diebold*, 369 U.S. at 655, 82 S.Ct. at 994. Although defendants have not produced clearcut evidence that IVB knew of

the partnership's misrepresentations as to financing, they have presented evidence from which a rational trier of fact could conclude that IVB had actual knowledge of a fraudulent statement in the PPM, and thus was not a holder in due course. Plaintiff's motion for summary judgment therefore is denied as to all defendants except as discussed in Section V.

\* \* \*

For the above reasons, plaintiff's motion for summary judgment is granted in the cases involving defendants Rosen, Hacker, Nierenberg, Ebert, John Spolyar, Pessin and Doerge. Plaintiff's motion for summary judgment is denied as to all other cases listed in the caption to this opinion.

SO ORDERED.

**15.** Insofar as *Unico* found notice or bad faith simply on the basis of the "close connection" doctrine, I decline to follow it.